# EXHIBIT 4

                     **REMOTE DEPOSITION BY VIDEOCONFERENCE**

                            **MARGARET WALLACE BROWN**

                                   **TAKEN ON**

                            **WEDNESDAY, MAY 11, 2022**

                                  **10:30 A.M.**


         **THE COURT REPORTER:** And then I'd also like to stipulate for the record that the remote affirmation and remote testimony will be administered and recorded by myself, a professional digital recorder, and that all present agree.

         The testimony will be transcribed and certified. Ms. Matias, on behalf Pacific Legal do you agree?

         **MS. MATIAS:** Yes, I agree.

         **THE COURT REPORTER:** All right. And then Mr. Amis, on behalf of the City of Houston, do you agree?

         **MR. AMIS:** Yes.

         **THE COURT REPORTER:** Okay. Fantastic. All right. The time is 10:33. Ms. Wallace Brown, would you please raise your right hand.

         Do you affirm under the penalty of perjury that you are Margaret Wallace Brown and that the testimony you're about to give is the truth, the whole truth, and nothign but the truth?

         **THE WITNESS:** Yes.

         **THE COURT REPORTER:** All right. Counsel, for the

1 record, would you please state your name and whom you

2 represent.

3   **MS. MATIAS:** Dawna Matias, M-a-t-i-a-s, representing

4 plaintiff Anthony Barilla.

5   **MR. AMIS:** Brian Amis, representing the City of

6 Houston.

7   **THE COURT REPORTER:** All right. You may proceed.

8 **MARGARET WALLACE BROWN**, having been first duly sworn, was

9 examined, and testified as follows:

10 **EXAMINATION**

11 **BY MS. MATIAS:**

12  Q Good morning, Ms. Wallace Brown.

13  A Good morning.

14  Q My name is Dawna Matias, and I'm with colleagues

15 Anastasia Bowden and Joshua Polk, and we represent the

16 plaintiff Anthony Barilla in this case.

17   And, first, I'd like to go over just some preliminary

18 matters before we get started with more substantiate questions.

19 Okay?

20  A Yes.

21  Q Will you please state your name and spell it for the

22 record?

23  A Margaret Wallace Brown, M-a-r-g-a-r-e-t, W-a-l-l-a-c-

24 e, B-r-o-won.

25  Q Okay. Thank you. And are you familiar with this

```
 1       Q    Okay.  And can we agree to call that part of the
 2   busking ordinance the permit requirement?
 3       A    Yes.
 4       Q    Okay.  Are you employed by the City of Houston,
 5   defendant City of Houston?
 6       A    Yes.
 7       Q    In what department?
 8       A    Planning and development department.
 9       Q    Okay.  And what does planning and development -- what
10   does the planning and development department do, what are their
11   responsibilities?
12       A    Our responsibilities include managing the land
13   development ordinances for the city of Houston and our
14   extraterritorial jurisdiction, we manage the geographic
15   information system for the city of Houston, we do
16   transportation planning, neighborhood planning such as
17   character preservation tools, historic preservation, and we
18   manage the tower ordinance and a variety of other projects as
19   assigned by the mayor.
20       Q    Okay.  And what is your formal title or position?
21       A    I'm director of the department.
22       Q    Okay.  Can you describe your duties in this position?
23       A    I manage our team of approximately 90 people who the
24   -- to do all of the responsibilities that I mentioned earlier,
25   yeah, Lord knows --
```

1    Q    Okay.
2    A    -- just what it is.  I mean, I manage the whole
3 operation so that includes, you know, day to day operations, as
4 well as speaking to city council and, you know, everything a
5 director does.
6    Q    Okay.  Any other duties?
7    A    As part of my duties, and I am secretary to both the
8 Planning Commission and the Historic and Archaeological
9 Commission -- well, actually, all three, The Tower Commission
10 also.
11   Q    Okay.  And how long have you held this position?
12   A    I was promoted interim director in 2018 and made
13 permanent director in 2019.
14   Q    Okay.  Did you hold any other position in the
15 **department prior to this?**
16   A    Yes, I've been with the city for 35 years all in this
17 department starting as a project manager in 1986 and having
18 progressively advanced jobs until I received this one.
19   Q    Okay.  And did you hold any other position in -- with
20 **the city of Houston prior to your work in the planning**
21 **department -- planning and development?**
22   A    So for a period of about six years -- six months in
23 1991, the department which used to include community
24 development, block current activities, when that was split from
25 the planning department I was temporarily -- so for a period of

1  about six months I worked for the community development

2  department that was split off from planning, but then very

3  quickly came back to planning --

4        Q    Okay.  And what was your --

5        A    -- and nothing else besides that.

6        Q    Oh, okay.  Sorry.  I apologize, I talked over you.

7        A    That's okay.

8        Q    **What was your job experience prior to employment with**

9  **the city of Houston?**

10       A    I worked for a land developer here in Houston, Texas,

11 Intercorporation, I was the project architect for them for

12 interior remodels on one of their high rise residential towers.

13       Q    Okay.  Anything else?

14       A    While I was in school I had a variety of secretarial

15 and other clerical jobs, but, no, that was my first post-

16 college professional job.

17       Q    **And can you please describe your educational**

18 **experience?**

19       A    Bachelor of Science in -- with a concentration in

20 Architecture from the University of Houston, and I have

21 approximately 12 hours towards a Master's in Business

22 Administration from the University of St. Thomas, and I have a

23 variety of certifications from -- professional certifications

24 for my area of expertise.

25       Q    Okay.  Do you understand why you've been called to be

```
 1  deposed today?
 2      A    Yes.
 3      Q    Okay.  What is your understanding of that?
 4      A    My understanding is that I am representing the city
 5  of Houston as my position as director for the planning
 6  department because some of this work originated from the
 7  planning department.
 8      Q    Okay.  I'd like to introduce, as I guess it would be,
 9  Exhibit C the notice of rule 30B6 deposition of the city of
10  Houston.
11      A    Okay.
12      Q    Take a look at that, please.
13      A    Okay.
14      Q    Do you see it -- do you --
15      A    Yes.
16      Q    -- see on the -- pages 1 it's a three page document
17  and there are a list of numbered topics on those three pages --
18      A    Mm-hmm.
19      Q    Do you understand that you've been designated by your
20  council to answer questions about the following topics, and I'm
21  going to list them and after each you can say either yes or no
22  that you understand --
23      A    Okay.
24      Q    -- you've been designated.  So the first is number 3,
25  defendant's interpretation and application of the busking
```

1  cleanliness, litter, that type of thing on that end of the
2  spectrum would be -- are something that the city cares deeply
3  about, we care about the way our streets look and whether
4  somebody's wearing a green outfit versus a red outfit doesn't
5  matter.
6      Q    Okay.  And do you think then that there is -- that
7  having buskers in the city of Houston somehow interferes with
8  an esthetic concern?
9      A    No, I'm not sure I would say that.
10     Q    Okay.  All right.  Is there something about the
11 theater district that is particularly well suited for avoiding
12 traffic and pedestrian safety issues?
13     A    That is particularly suited -- well, in the theater -
14 - so the part of the rationale in creating the theater district
15 was to create a very walkable area where Houstonians could, you
16 know, enjoy the theater, enjoy a dinner before the theater,
17 enjoy a very vibrant part of Houston.
18          I mean, we're trying to encourage a vibrancy in the
19 theater district, and I think that lends itself well to a
20 busker, but I also think that there -- that it highlights the
21 need to be cautious about the safety of pedestrians and
22 automobile traffic throughout that area.
23     Q    So if you were creating an area of vibrancy --
24     A    Mm-hmm.
25     Q    -- would that raise more concerns about pedestrian

```
 1   I have any evidence that -- documents that -- and the answer is
 2   no, but I would say that it's the city of Houston's interest
 3   to, you know, protect our property owners and provide service
 4   to everyone and -- no.  I mean, I guess -- okay.  So ask the
 5   question again.  I think I'm getting way off track --
 6        Q    Okay.
 7        A    -- looking for circles and there aren't any.
 8        Q    Okay.
 9        A    So just ask the question again.
10        Q    Okay.  Let me try again.  What evidence do you have
11   to support the idea that requiring a busker to obtain written
12   permission from an abutting property owner serves the interest
13   of protecting neighboring property owners from loud noises and
14   distractions?
15        A    No, I don't have any evidence that it does that.
16        Q    Okay.  Thank you.  And then on what basis do you make
17   the claim that there is an interest in protecting the effects
18   on neighboring properties and property owners?
19        A    I think this is a little bit longer answer than what
20   you want, but I do know that when -- so I work in an office
21   building and there are often times events in the streets around
22   me.  I'm adjacent to a couple city parks, and it can be very
23   disruptive to operations when there is this type of noise going
24   on constantly.
25             Luckily, I'm only close to it on periodic basis's,
```

```
 1  but if there were a busker who were in front of my office
 2  everyday I think it could be disruptive to my operation, and I
 3  think when the city of Houston and Central Houston initiated
 4  this effort, you know, we were stepping into unknown, you know,
 5  going into -- we didn't have -- we were stepping into the
 6  unknown, we didn't know, you know, what would -- how many
 7  hundreds of people might come out or not and so there was a
 8  concern that if we do this we need to be more protective about
 9  the adjacent property owners.
10          ==We need to have a consideration for them as well and==
11  ==so it was, you know, an effort for the city to recognize that==
12  ==there might be some challenges for property owners created by==
13  ==this effort knowing how we dealt with it.==
14      Q   Okay.  And would it be equally disruptive then if
15  there were just a loud street performer out there, but they
16  weren't asking for tips?
17      A   Well, probably yes.
18      Q   Is there a noise ordinance in place in the city of
19  Houston?
20      A   There is.
21      Q   Does it apply also to the theater district?
22      A   Yes.
23      Q   Okay.  Describe how requiring a busker to describe
24  their performance in advance serves the interest of traffic or
25  pedestrian safety?
```

```
 1                      IN THE UNITED STATES
 2                      DISTRICT COURT FOR THE
 3           SOUTHERN DISTRICT OF TEXAS (HOUSTON DIVISION)
 4
 5   ANTHONY BARILLA
 6   VERSUS              CASE NO.: 4:20-CV-00145
 7   CITY OF HOUSTON, TEXAS
 8
 9
10                      REPORTER'S CERTIFICATION
11              DEPOSITION OF MARGARET WALLACE BROWN
12                          MAY 11, 2022
13
14   I, ARIA MENDOZA, Court Reporter, hereby certify to the
15   following:
16   That the witness, MARGARET WALLACE BROWN, was duly sworn by the
17   officer and that the transcript of the oral deposition is a
18   true record of the testimony given by the witness;
19   That the deposition transcript was submitted on 26th day of May
20   2022, to the witness or to the attorney for the witness for
21   examination, signature and return to NAEGELI DEPOSITION AND
22   TRIAL by June 15, 2022;
23   That the amount of time used by each party at the deposition is
24   as follows:
25           Anastasia P. Boden, Esquire - 0 hr 00 min
```

```
 1         Joshua W. Polk, Esquire - 0 hr 00 min
 2         Donna G. Matias, Esquire - 1 hr 32 min
 3         Brian A. Amis, Esquire - 0 hr 00 min
 4         Daniel Oliver, Esquire - 0 hr 00 min
 5  That pursuant to information given to the deposition officer at
 6  the time said testimony was taken, the following includes
 7  counsel for all parties of record:
 8
 9         Anastasia P. Boden, Esquire - ATTORNEY FOR PLAINTIFF
10         Joshua W. Polk, Esquire - ATTORNEY FOR PLAINTIFF
11         Donna G. Matias, Esquire - ATTORNEY FOR PLAINTIFF
12         Brian A. Amis, Esquire - ATTORNEY FOR DEFENDANT
13         Daniel Oliver, Esquire - ATTORNEY FOR DEFENDANT
14       I further certify that I am neither counsel for, related
15  to, nor employed by any of the parties or attorneys in the
16  action in which this proceeding was taken, and further that I
17  am not financially or otherwise interested in the outcome of
18  the action.
19  Certified to by me this 26th day of May 2022.
20
21
22         [signature]
23  _____
24  Aria Mendoza, No. 818
25
```